IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MADELENE WIGGERS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 09-86 Erie |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., District Judge.

    Plaintiff, Madelene Wiggers, ("Plaintiff"), commenced the instant action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security denying her claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 *et seq,* and § 1381 *et seq.* Plaintiff filed applications for DIB and SSI on July 24, 2006, alleging disability since October 25, 2005 due to a ruptured disc in her back, hepatitis C and bipolar disorder (Administrative Record, hereinafter "AR", 80-90; 131). Her applications were denied and she requested a hearing before an administrative law judge ("ALJ") (AR 60-69; 71-72). A hearing was held before an administrative law judge ("ALJ") on November 18, 2008 and following this hearing, the ALJ concluded that the Plaintiff was not entitled to a period of disability, DIB or SSI under the Act (AR 12-44). Her request for review by the Appeals Council was denied (AR 1-4), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending before the Court are cross-motions for summary judgment. For the reasons set forth below, I will deny both motions and the matter will be remanded to the Commissioner for further proceedings.

### I. BACKGROUND

    Plaintiff was thirty-four years old on the date of the ALJ's decision (AR 21). She did not

finish high school but earned a General Educational Development ("GED") diploma, and has past relevant work experience as a clerk and clerk/assistant manager at a convenience store (AR 21). Plaintiff claims an inability to work due to both mental and physical impairments.

*Mental impairments*

Plaintiff was evaluated by Helen Kohn, M.D., at Stairways Behavioral Health Outpatient Clinic on March 13, 2006 upon referral by her social worker (AR 159-162). Plaintiff reported that she lived in a shelter with her six year old son (AR 159). She stated she was suffering from depression and had negative "racing" thoughts (AR 159). Plaintiff described a history of aggressive behavior, a history of being a victim of domestic violence and had two previous suicide attempts (AR 160). She additionally reported a history of drug and alcohol abuse, but claimed she been abstinent since July 1, 2005 (AR 160-161). Plaintiff indicated that she quit her job as a cashier for Wal-Mart due to back problems (AR 160).

On mental status examination, Dr. Kohn reported that her affect was appropriate throughout the evaluation, except when she became tearful upon recalling being teased in school (AR 161). She was cooperative, alert, exhibited good eye contact, was appropriately groomed and showed no unusual mannerisms (AR 161). Dr. Kohn found her speech spontaneous, her thought processes organized and relevant and she exhibited average cognitive function (AR 161-162). Dr. Kohn diagnosed her with major depressive disorder, recurring, moderate; polysubstance dependence in early remission; rule out borderline personality disorder; and assigned her a Global Assessment of Functioning ("GAF") score of 50 (AR 162).[1] She referred the Plaintiff to individual counseling and started her on Lamictal for mood stabilization (AR 162).

---

[1]The GAF score considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. Scores between 41 and 50 indicate "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed. 2000).

Progress notes from Stairways reflect that in April 2006, the Plaintiff complained that the Lamictal was causing insomnia (AR 158). In July 2006, the Plaintiff complained of insomnia, "racing thoughts," anxiety and irritability (AR 157). She denied any suicidal/homicidal thoughts, and her medications were adjusted (AR 157).

Plaintiff was psychiatrically evaluated by Ann McDonald, M.D., pursuant to the request of the Commissioner on October 13, 2006 (AR 175-181). Plaintiff reported that she was currently sober, but relayed an extensive history of substance abuse starting at age five (AR 175). On mental status examination, Dr. McDonald noted that the Plaintiff was labile with thoughts of self harm, but she denied suffering from any hallucinations or delusions (AR 177). Although she could name the current president, she was unable to discuss current events (AR 177). Dr. McDonald found her thinking "quite concrete" when interpreting proverbs and she had difficulty performing serial 7's (AR 177). Dr. McDonald estimated her IQ to be in the 90 to 100 range, but noted that self-control and concentration were "issue[s] for her" (AR 177). She diagnosed the Plaintiff with atypical bipolar disorder; post-traumatic stress disorder; polysubstance addiction; borderline personality disorder; and assigned her a GAF of 35 to 40 (AR 178-179).[2]

Dr. McDonald opined that the Plaintiff was slightly impaired in her ability to understand, remember and carry out short, simple instructions; slightly to moderately limited in her ability to make judgments on simple work-related decisions; moderately impaired in her ability to interact appropriately with the public and co-workers, and respond appropriately to work pressures and changes in a routine work setting; and moderately to markedly limited in her ability to understand, remember and carry out detailed instructions and interact appropriately with supervisors (AR 178; 180).

On February 6, 2007, Roger Glover, Ph.D., a state agency reviewing psychologist,

---

[2]Scores between 31 and 40 indicate "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; ...)." *Id.*

completed a Mental Residual Functional Capacity Assessment form, and found that the Plaintiff was not significantly limited in a number of areas, but was moderately limited in her ability to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; and perform activities within a schedule, maintain regular attendance and maintain punctuality (AR 206). She was also moderately limited in her ability to interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others (AR 207). On a Psychiatric Review Technique form completed the same date, Dr. Glover concluded that the Plaintiff had a mild restriction of activities of daily living; moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace; and had no repeated episodes of decompensation of extended duration (AR 220).

  According to Dr. Glover, the Plaintiff remained capable of understanding and remembering instructions, concentrating, interacting appropriately with people and adapting to changing activities within the workplace (AR 208). She would be able to maintain regular attendance and be punctual, was capable of asking simple questions and accepting instructions, and could function in production oriented jobs requiring little independent decision-making (AR 208). Dr. Glover found that Dr. McDonald's assessment of the Plaintiff's functional abilities was inconsistent with the other evidence of record rendering it "less persuasive" (AR 208). He concluded that the Plaintiff could "meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment" (AR 208).

  On December 29, 2008, Gloria Swietlik Kieffer, M.A., a Licensed Psychologist, reported that she provided outpatient counseling to the Plaintiff beginning in September 2008 (AR 242). Ms. Kieffer indicated that the Plaintiff "carries a long term diagnosis of Bipolar Disorder and a Polysubstance Abuse history" (AR 242). She reported that the Plaintiff's symptoms of depression and manic traits were "usually" in the moderate range with a GAF score from 50 "at

wors[t]" to 65 "at best" (AR 242).³  Ms. Kieffer noted that the Plaintiff suffered from low self-esteem but that her effort at treatment was "very good" (AR 242).

*Physical impairments*

On December 30, 2005, Plaintiff was seen at Community Health Net for complaints of back pain exacerbated by prolonged standing and sitting (AR 151).  Plaintiff reported that she had not consumed alcohol for the previous six months (AR 151).  Plaintiff further reported she had hepatitis C (AR 151).  On physical examination, her straight leg raise test was negative, and she was prescribed Naprosyn and Flexeril (AR 151).

On September 28, 2006, Plaintiff was evaluated by Ramin Sassani, D.O., a consulting examiner, pursuant to the request of the Commissioner for her complaints of low back pain, bipolar disorder and hepatitis C (AR 166-174).  Plaintiff reported that her back pain began in 2001 while she was doing push-ups with her child on her back (AR 166).  She indicated that she was being treated at Stairways for her bipolar disorder, but was not compliant with her medication (AR 166).  She claimed she had not been abusing alcohol or drugs for the previous fourteen months (AR 167).  On physical examination, Dr. Sassani found the Plaintiff was pleasant, fully oriented and in no acute distress (AR 168).  Dr. Sassani noted that the Plaintiff was "positive" for arthritis and muscle pain, but reported that her gait was normal, she had no trouble ambulating, and had no motor or sensory deficits (AR 168-169).  Her straight leg raise test was negative bilaterally in both the supine and sitting position, she was able to walk on her heels and toes, and she exhibited a full range of motion throughout (AR 169; 173-174).  Dr. Sassini recommended MRI studies since her physical examination did not reveal any abnormality (AR 169).  Unable to rule out spinal stenosis or an "early disc issue," Dr. Sassani formed an impression of possible degenerative joint disease, as well as hepatitis C (AR 169).  He

---

³Scores between 61 and 70 indicate "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.  *Id.*

recommended that the Plaintiff be compliant with her bipolar medications and noted that she was not a candidate for hepatitis C therapy due to her bipolar disorder (AR 169).

Dr. Sassani completed a Medical Source Statement relative to the Plaintiff's ability to perform work-related physical activities (AR 171-172). On this form, Dr. Sassani checked off findings indicating that the Plaintiff could occasionally lift and carry twenty pounds; stand and/or walk up to one hour and sit for less than six hours in an eight-hour day; was limited in her pushing and pulling ability in her lower extremities; and was limited to bending only occasionally (AR 171-172).

Plaintiff was examined by Ron Bonfiglio, M.D., on October 31, 2006 for her complaints of low back pain radiating into her leg (AR 182-185). Plaintiff complained of a combination of aching and stabbing pain in her lower back, as well as constant numbness in her right leg and foot (AR 182). Dr. Bonfiglio noted that Plaintiff's MRI dated September 7, 2006 showed a moderately large disc herniation at the L4-L5 level (AR 182). Physical examination revealed that the Plaintiff had a mildly antalgic and stiff gait but with a good base of support and good cadence (AR 184). No significant back tenderness was found, but she had some increased right-sided back pain on straight leg raise testing that was tolerated to 90 degrees bilaterally (AR 184). Dr. Bonfiglio also found she had decreased lumbar lordosis; full motor strength on the left; 4/5 motor strength on the right; normal deep tendon reflexes; diminished right leg and foot sensation; and intact sensation on the left (AR 184).

Dr. Bonfiglio diagnosed the Plaintiff with, *inter alia*, right-sided, herniated disc at L4-5 and right lower limb paresthesias (AR 184). He discontinued the Voltaren and prescribed Motrin 800 milligrams three times daily (AR 184). He recommended that the Plaintiff follow up at a rehabilitation clinic in eight weeks and undergo an evaluation for possible epidural injections if her back pain persisted (AR 184).

Plaintiff was treated by Robert Kiel, D.O. for her hepatitis C condition beginning in November 2006 through September 2008 (AR 186-187; 230-241). Dr. Kiel's treatment notes do

not refer to any abnormal findings relative to the Plaintiff's back and/or lower extremities (AR 186-187; 230-241). However, in July 2008, Dr. Kiel referenced the Plaintiff's "flight of ideas" in connection with his neurological evaluation (AR 232).

On December 19, 2006, the Plaintiff underwent a discogram and nucleoplasty performed by Jacob Agris, M.D. for her herniated disc (AR 199-200). Dr. Agris found good opacification of the nucleous pulposus and penetration of the annulus in the right anterior location, but there was no extravasation to suggest a complete tear (AR 200). Plaintiff tolerated the procedure well and was prescribed Motrin for pain relief (AR 200).

Martha McMichael, a state agency reviewing consultant, reviewed the medical evidence of record on February 6, 2007 and concluded that the Plaintiff could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds; stand, walk and/or sit for about six hours in an eight-hour day; was unlimited in her pushing and pulling ability; and could only occasionally engage in postural activities (AR 224-225). In support of her assessment, Consultant McMichael reviewed the unremarkable findings by Dr. Sassani and Dr. Bonfiglio and noted the Plaintiff's ability to care for herself and young child, as well as maintain her home (AR 229). Consultant McMichael further noted that following treatment for her herniated disc, she did not require physical therapy, narcotic pain medication, an assistive device for ambulation, and did not use a TENS unit (AR 229).

*Hearing testimony*

Plaintiff testified at the administrative hearing that she lived with her eight year old son and his paternal grandmother in a rent house (AR 28-29). She suffered from depression and bipolar disorder which caused feelings of paranoia and persecution (AR 33-34). Plaintiff claimed her mental impairments caused good days and bad days, and at times she suffered from extreme physical fatigue which resulted in her sleeping "a lot" (AR 34-35). She indicated that at times she was unable to sleep, had racing thoughts and suffered from anxiety (AR 35-36). She also testified to suicidal thoughts but claimed she would not follow through because of her child

(AR 35-36). Plaintiff testified that she suffered a relapse and engaged in substance abuse for approximately one year, from July 2007 until July 2008, but at the time of the hearing had been abstinent for approximately nine months (AR 37-38). Plaintiff indicated that she was not taking medication due to her pregnancy, but that Lamictal and Geodon helped control the severity of her mood swings (AR 39-40). She also attended counseling on a weekly basis, and was scheduled to have her medications reevaluated following the delivery of her child (AR 42). Finally, the Plaintiff testified that she was not seeing any other healthcare provider other than her obstetrician and gastroenterologist for her hepatitis C (AR 43).

Following the hearing, the ALJ issued a written decision finding that the Plaintiff was not entitled to a period of disability, DIB or SSI within the meaning of the Social Security Act (AR 12-24). Her request for review by the Appeals Council was denied rendering the ALJ's decision the final decision of the Commissioner. She subsequently filed this civil action.

## II. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

## III. DISCUSSION

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). Title XVI of the Act establishes that SSI benefits are payable to those individuals who are similarly

disabled and whose income and resources fall below designated levels.  42 U.S.C. § 1382(a).  A person who does not have insured status under Title II may nevertheless receive benefits under Title XVI.  *Compare* 42 U.S.C. § 423(a)(1) *with* 42 U.S.C. § 1382(a).  In order to be entitled to DIB under Title II, a claimant must additionally establish that his disability existed before the expiration of his insured status. 42 U.S.C. § 423(a), (c).  The ALJ found that the Plaintiff met the disability insured status requirements of the Act through the date of his decision (AR 22).  SSI does not have an insured status requirement.

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment.  *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).  If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability.  *Bowen*, 482 U.S. at 141.  If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past.  *Id.*  If the claimant satisfies this burden, the [Commissioner] must grant the claimant benefits unless the [Commissioner] can demonstrate (5) that there are jobs in the national economy that the claimant can perform.  *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117.  The ALJ resolved Plaintiff's case at the fifth step.  The ALJ found that Plaintiff's degenerative disc disease of the lumbar spine, mood disorder and polysubstance abuse in early remission were severe impairments, but determined at step three that she did not meet a listing (AR 14-16).  The ALJ further found she had the residual functional capacity ("RFC") to perform light work with the following exceptions: she was limited to occasional climbing, balancing, stooping, kneeling, crouching, and crawling, and was relegated to the performance of

simple, unskilled work with no frequent contact with the general public (AR 16). The ALJ concluded, after considering the Plaintiff's age, education, work experience and RFC, and without consulting a vocational expert, that there were jobs that existed in significant numbers in the national economy that the Plaintiff could perform (AR 21-22). The ALJ also found that the Plaintiff's statements concerning the limiting effects of her symptoms were not credible to the extent they were inconsistent with his assessed RFC (AR 17). Again, I must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Plaintiff challenges the ALJ's residual functional capacity determination. "'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3rd Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3rd Cir. 1999); *see also* 20 C.F.R. § 404.1545(a). An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. § 416.927(e)(2). In making this determination, the ALJ must consider all evidence before him. *Burnett*, 220 F.3d at 121. Social Security Ruling 96-5p provides:

> The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of the evidence.

*Soc. Sec. Rul*. 96-5p (1996), 1996 WL 374183 *5. The ALJ found the following with respect to the Plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following exceptions: only occasional climbing, balancing, stooping, kneeling, crouching, and crawling. She is relegated to the performance of simple, unskilled work with no frequent contact with the general public. (AR 16).

Light work is defined in the following terms:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting and carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b); 416.967(b). In addition, "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours out of an 8-hour workday. Sitting may occur intermittently during the remaining time." Social Security Ruling ("SSR") 83-10, 1983 WL 31251 at *6.

With respect to the Plaintiff's alleged physical impairments, Plaintiff argues that the ALJ erred in rejecting Dr. Sassani's conclusion that she was unable to work a full eight-hour day.[4] Here, however, the ALJ fully reviewed and discussed Dr. Sassani's evaluation of the Plaintiff, emphasizing the unremarkable physical examination findings (AR 18-19). Specifically, the ALJ observed that Dr. Sassani found that the Plaintiff's gait was normal; her quadricep and hamstring strength was "good" bilaterally; her straight leg raising testing was negative in both the supine and sitting positions; she was able to walk on her heels and toes; and she had no neurological deficits (AR 19; 168-169). The ALJ further observed that Dr. Sassani had recommended further evaluation for her complaints of back pain since her physical examination "did not show any abnormalities" (AR 19; 169). The ALJ accorded "significant weight" to the opinion of Consultant McMichael, who concluded that the Plaintiff could perform light work but could only occasionally engage in postural activities, since it was "consistent with the record as a whole" (AR 20-21; 224-225). Consultant McMichael reviewed the unremarkable findings by Dr.

---

[4]Plaintiff also argues that the ALJ erred in rejecting Dr. Sassani's conclusion that she could only lift ten pounds occasionally. *See* Plaintiff's Brief p. 9. I find no merit to this argument; Dr. Sassani concluded that she could lift twenty pounds (AR 171), and the ALJ included this limitation in formulating her RFC.

Sassani and Dr. Bonfiglio and noted the Plaintiff's ability to care for herself and young child, as well as maintain her home (AR 229). She further noted that following treatment for her herniated disc, the Plaintiff did not require physical therapy, narcotic pain medication, an assistive device for ambulation, and did not use a TENS unit (AR 229). In light of the above, I find substantial evidence supports the ALJ's rejection of Dr. Sassani's conclusion relative to the Plaintiff's inability to work a full eight-hour day.

Plaintiff also challenges the ALJ's RFC assessment relative to her alleged mental impairments. Plaintiff argues that the ALJ failed to address Dr. McDonald's conclusions that she would be moderately to markedly impaired in her ability to relate appropriately to supervisors. *See* Plaintiff's Brief pp. 9-10. Contrary to the Plaintiff's contention, the ALJ did address Dr. McDonald's opinion that she had "moderate" to "marked" limitations in dealing with supervisors. In according "less weight" to Dr. McDonald's opinion in that regard, the ALJ stated:

> As for the opinion evidence, in October 2006 Dr. McDonald, the consultative examiner, opined that the claimant has "moderate" to "marked" limitations for dealing with supervisors, but also notes a diagnosis of polysubstance abuse (Exhibit 9F). The undersigned believes this is why Disability Determination Services (DDS) rejected the findings of the consultative examiner and concluded that she could do simple, routine, repetitive tasks (Exhibit 13F). The undersigned agrees with DDS and accords Dr. McDonald's opinion less weight (AR 20) (emphasis in original).

(AR 20). Notably, however, in rejecting Dr. McDonald's conclusion relative to the Plaintiff's ability to deal with supervisors, the ALJ failed to address the findings Dr. Glover, from the DDS, that the Plaintiff was "moderately" limited in her ability to "respond appropriately to criticism from supervisors" (AR 207). In so doing, the ALJ failed to consider and address potentially probative medical evidence as required by controlling case law. *See Adorno v. Shalala*, 40 F.3d 43, 48 (3rd Cir. 1994) (ALJ is required to weigh all relevant, probative and available evidence); *Cotter v. Harris*, 642 F.2d 700, 706-07 (3rd Cir. 1981) (ALJ must provide some explanation when

he has rejected relevant evidence or when there is conflicting probative evidence in the record).[5]

Plaintiff further argues that the ALJ failed to give meaningful consideration to her GAF scores ranging from 35 to 50 in fashioning her RFC. *See* Plaintiff's Brief p. 9. The record reveals that the Plaintiff was assessed a GAF score of 50 in February 2006, a GAF score of 35 to 40 in October 2006, and a GAF score of 50 to 65 in February 2008 (AR 162; 179; 242). The ALJ did not acknowledge or address in any fashion the Plaintiff's GAF score of 35 to 40. While he did note the GAF score of 50 in February 2006 was indicative of serious symptoms, he failed to indicate how he "considered and weighed the importance of these scores." *Span v. Barnhart*, 2004 WL 1535768 at *7 (E.D.Pa. 2004). As this Court recently stated:

> Pursuant to the final rules of the Social Security Administration, a claimant's GAF score is not considered to have a "direct correlation to the severity requirements." *See* 66 *Fed.Reg.* 50746, 50764-65 (2000). Nonetheless, the GAF remains the scale used by mental health professionals to "assess current treatment needs and provide a prognosis." *Id.* As such, "it constitutes medical evidence accepted and relied upon by a medical source and *must* be addressed by an ALJ in making a determination regarding a claimant's disability." *Watson v. Astrue*, 2009 WL 678717 at *5 (E.D.Pa. 2009) (emphasis in original), *citing Colon v. Barnhart*, 424 F. Supp. 2d 805, 812 (E.D.Pa. 2006); *see also Santiago-Rivera v. Barnhart*, 2006 WL 2794189 at *9 (E.D.Pa. 2006) (case remanded since claimant's GAF score of 50 indicated serious symptoms and ALJ failed to discuss score); *Span v. Barnhart,* 2004 WL 1535768 at *7 (E.D.Pa. 2004) (absent from ALJ's discussion was any meaningful indication of how he considered claimant's GAF scores or discounted their significance); *Escardille v. Barnhart,* 2003 WL 21499999 at *7 (E.D.Pa. 2003) (case remanded because ALJ failed to mention claimant's GAF score of 50 which constituted a specific medical finding that claimant unable to perform competitive work).
>
> Because the ALJ is required to give some reason for discounting the evidence he rejects, *see Adorno v. Shalala,* 40 F.3d 43, 48 (3rd Cir. 1994), and the ALJ's decision here fails to address the GAF score evidence, I am unable to conclude that his decision is supported by substantial evidence. The case shall be remanded to the Commissioner who is directed to specifically discuss this evidence on remand.

---

[5]I also find that the ALJ's failure to address Dr. McDonald's findings that the Plaintiff was moderately limited in her ability to respond to changes in a routine work setting, get along with co-workers and tolerate work pressures also runs afoul of the case law set forth above.

*Burkett v. Astrue,* 2010 WL 724509 at *9 (W.D.Pa. 2010), quoting *Rhodes v. Astrue*, 2009 WL 3287011 at *6 (W.D.Pa. 2009).

Here, the Plaintiff's GAF score of 50 indicates "serious" symptoms, while a GAF score of 35 denotes "major impairment" in several areas of functioning, both of which could support a finding of a serious impairment in social or occupational functioning. *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed. 2000); *Irizarry v. Barnhart,* 233 Fed. Appx. 189, 192 (3rd Cir. 2007) (failure to consider and discuss contrary GAF scores basis for remand).

Finally, the Plaintiff challenges the ALJ's application of the medical-vocational guidelines (the "Grids") and reliance on a Social Security Ruling in deciding her case without utilizing a vocational expert. The Grids were promulgated in order to establish the types and number of jobs that exist in the national economy for claimants with exertional impairments. *See* 20 C.F.R. § 416.969. They consist of a matrix of four factors including physical ability, age, education and work experience, and provide guidance as to whether a particular combination of all four factors direct a decision of "disabled" or "not disabled." *See Sykes v. Apfel*, 228 F.3d 259, 263 (3rd Cir. 2000); *Santise v. Schweiker*, 676 F.2d 925, 928 (necessity Cir. 1982). "Where a claimant's qualifications correspond to the job requirements identified by a rule, the guidelines direct a conclusion that work exists that the claimant can perform." *Sykes*, 229 F.3d at 263. Where a claimant suffers only non-exertional limitations, an ALJ may refer to the grids when he relies on a Social Security Ruling, which includes a statement explaining how said non-exertional limitations affect the claimant's occupational job base. *Allen v. Barnhart*, 417 F.3d 396, 404 (3d Cir. 2005).

Given the fact that this matter will be remanded, I need not address the issue of whether the ALJ erroneously relied on a Social Security Ruling in lieu of vocational expert testimony. However, if the Commissioner on remand intends to rely on *SSR* 85-15 as a substitute for vocational expert testimony, or any other Ruling for that matter, advance notice should be given

to the Plaintiff "as a matter of fairness" so she can determine whether to call her own vocational expert. *Allen*, 417 F.3d at 407-08 (noting that advance notice is not required but stating "as a matter of fairness, alerting a claimant to the relevant rule in advance will always be appropriate"); *Meyler v. Comm'r of Soc. Sec.*, 238 Fed. Appx. 884, 890 (3rd Cir. 2007) ("[b]ecause the ALJ provided no notice to [the claimant], we give close scrutiny to his reliance on SSR at step five").

## IV. CONCLUSION

For the reasons set forth above, this matter is remanded to the ALJ to explicate his reasons for rejecting the moderate limitations relative to the Plaintiff's mental impairments imposed by Dr. McDonald and Dr. Glover. In addition, the ALJ is directed to address the significance, if any, he accords the Plaintiff's GAF score of 35 to 40.

An appropriate Order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MADELENE WIGGERS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 09-86 Erie |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## **ORDER**

AND NOW, this 10th day of May, 2010, and for the reasons stated in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment [Doc. No. 7] is DENIED and Defendant's Motion for Summary Judgment [Doc. No. 9] is DENIED. The case is hereby REMANDED to the Commissioner of Social Security for further proceedings consistent with the accompanying Memorandum Opinion.

The clerk is hereby directed to mark the case closed.

                                                                               s/ Sean J. McLaughlin
                                                                               United States District Judge

cm: All parties of record.